Good morning, Your Honors. May it please the Court. Good morning, Your Honors. My name is Nicolette Glazer, and I represent Mr. Yanko Lukov. Could you speak up a little bit? I apologize. I represent Mr. Lukov, the petitioner in this matter. I would like to reserve four minutes of my time for rebuttal. Your Honors, the main issue in this case is whether substantial evidence supports the agency negative credibility determination. And the answer is driven by what level of linguistic precision the agency could exact on an applicant who testifies with the aid of an interpreter in order to satisfy due process. We respectfully submit that in this case and on this record, no reasonable trier of fact will side with the agency that the inconsistencies were so grave and went to the heart of the application of the claim that considered with the totality of the evidence, Mr. Lukov was incredible. Now, this is a pre-Real ID Act. So the issue is under the pre-Real ID Act precedence, which requires that inconsistencies or contradictions are not trivial. We respectfully submit, Your Honors, that in this case, which involves three individual hearings in front of two different interpreters. Now, the adverse credibility finding that we're really talking about was made by the first IJ? No, Your Honor. We had the first IJ made a negative credibility determination in frivolous finding. On the first appeal, the BIA reversed the frivolous finding but left intact the credibility. A petition for review was filed in 2002 and after the opening brief, the government moved to remand. So there was never a decision on the first, the 2001 credibility by Judge Leve. On remand, there was another hearing in front of a second judge. At that time, the second judge upheld Judge Leve's initial credibility determination. Okay. So we got adverse credibility findings by both of the IJs? Correct. And so we went again on appeal. The BIA again remanded. And it said we are Mr. Lukov is entitled to amend and present additional evidence on the asylum application. So in 2009, Judge Hollis held a hearing on both the asylum application, the withholding and the CAT convention. And after that, he made a negative credibility determination. Now, he identified five inconsistencies and allowed the parties to brief the issue and submit rebuttal evidence and whatnot. Now, what's relevant is at that time, we submitted an extra medical certificate, which is the administrative record at page 333. And that was one of the issues that the judge was very puzzled. He found that these records convinced him that it was not a basis to find a negative credibility. So he omitted that. So he left only two of his inconsistency in the decision, but then resurrected two additional ones that came from the 2001 and 2006 decision. That was the 1999 New Year's Eve party and the birth certificate. So what we argued in front of the board was that Mr. Lukov was not given an opportunity to address the 1999 New Year's Eve accident, which is the main accident that made him flee. And what's relevant is that we have a medical document that significantly says this man was in a coma, and the surgeon said he's disoriented as to time and place, and there was an issue with his ability to recollect events. My time is up. So I would ‑‑ Kagan. Well, you've got a lot of time left, but let's hear from the government, and then you can use however much of that time you like. Thank you. Good morning. May it please the Court, Tiffany Walters for Respondent, United States Attorney General. The record here does not compel the conclusion that Lukov's asylum claim was credible when the agency identified and relied on specific inconsistencies that went to the heart of his claim that he was mistreated on account of his Roma ethnicity. Specifically when asked whether he was allowed to see his family while he was forced to serve in the military, Lukov testified that he was granted leave to get married to his wife, but was denied leave when he requested leave for the birth of his child and could recall no other leaves. And he ‑‑ and then when ‑‑ But he said he left the Army on a number of occasions, but he never really addressed whether he was given leave to do that. Isn't that his explanation? His explanation is when confronted with this medical evidence that suggested he was in his hometown, 150 kilometers from his duty station, was that he was ‑‑ he fled, he ran away from the Army on numerous occasions after being beaten. However, he didn't present this claim in his statement. He didn't present it in the first hearing before the immigration judge or the second or in direct on the third. It was only presented for the first time when confronted with his inconsistency with his medical documents. And inconsistency, you say ‑‑ but is the alleged inconsistency that he was given leave only once, or are you merely saying that the story got a lot better as time went on? There's essentially two inconsistencies. The first inconsistency is I was only granted leave once, but, in fact, I was in my hometown on a number of occasions, but then the second is the explanation. I know there's always a risk of translation, leave and so on, but if we're talking standard sort of western military or American military, you were either on leave or if you leave without leave, you're AWOL. Correct. That is to say, he could say, and it sounds like it's consistent with his having been given leave only once, well, the rest of the time I was AWOL. I was absent without leave. So I don't see that linguistic inconsistency as in any way fatal. On the other hand, if the story got a lot better as time goes on, that's a problem for him. To address Your Honor's concern, in his first hearing he was actually asked, did you have the opportunity to see your family while you were serving in the military? So it wasn't specifically were you granted leave versus were you AWOL, but it was did you have the opportunity to see your family, which presumably would encompass both officially granted leave and times in which I ran away from the Army, but I was able to go back to my hometown during those incidents. Were there translation problems here in these hearings? Well, Petitioner testified in his last hearing that he understood the interpreter and that he didn't have any problems. That was in what year? That was the 2009 hearing. So he's already been here nine years. Yes. That is his... Well, he testified that he didn't have problems understanding all of his interpreters going back to the 2001 hearing. Now, I really interpret Petitioner's argument to be not so much as to the Romanian or the language, his native language, but as to the interpreter's command of the English language. And certainly when you look at the transcript, there's some awkward conjugation. But when you look at the immigration judge's decision, after hearing that testimony via that first interpreter, it's clear that the issues identified by Petitioner didn't actually affect the immigration judge's understanding of the testimony. I mean, there was awkward phrasing regarding the issue around the term skinheads, but the immigration judge, as evidenced in his decision, clearly understood what was being testified regarding. Now, I want to go back to this army incident. That's not why he claimed he left his home country, is it? Well, he claimed he was mistreated on a number of occasions over the years on account of his Roma ethnicity. And he claimed that while he was serving in the military, he was subject to this harsher, more severe treatment because he was Roma. All right. And whether he was given leave or whether he left or not, I'm not sure. That really goes to the heart of his asylum claim. What really goes to the heart of that, it seems to me from reading this record, is the last incident in 1999 at the party where he was beaten so bad, I guess he had a concussion, he was in a coma. And isn't that what we should be concentrating on more than anything as far as . . . And this is a pre-real-idea case, so we have to look at whether this goes . . . the inconsistency goes to the heart of his case. And it seems to me the heart of his case is, I was beaten so badly, my life was in jeopardy, and I made the decision to leave. Shouldn't we be concentrating on that? That inconsistency is clearly very relevant to adverse credibility finding. So what is that inconsistency, that I woke up at home or I woke up in the hospital? His statement is that I woke up in the hospital and then he testified that I woke up at home and when confronted with the inconsistency, he attempted to rehabilitate by saying he would take it home but then take it to the hospital, none of which really addresses why he was unable to . . . Regardless of whether his head injury affected his memory at the time, it doesn't explain why his testimony changed over time between his statement. I'm having trouble finding an inconsistency there. He could have woken up at home and in the hospital. Have you ever had a concussion? I haven't, and I can't speak from personal . . . I have, and I can tell you I was waking up and passing out a number of times, and if you asked me at any given moment, where did you wake up, I might have said two different things or recalled two different things even today. So the fact of the matter is he was badly beaten, correct? There's medical evidence . . . That's his claim. Well, but there's medical evidence that he was in a coma, correct? Well, there's medical evidence . . . And that this was the straw that broke the camel's back as far as he was concerned about staying in his home country. He's testifying inconsistently regarding the events underlying this critical evidence of persecution. The only inconsistency is where he woke up or didn't wake up. Correct. How is that a material inconsistency? It goes to what actually occurred. I mean, you could pick any particular fact about that particular fact is only one among many regarding the incident, but the question is whether or not that incident occurred, and his testimony varied over time as to whether or not he woke up. His statement says the first thing I remembered was waking up in the hospital. The incident occurred, did it not? That's his claim. He has the medical records to show that he was in a coma. But those medical records were also inconsistent with his other testimony regarding his leaves from the Army. What's the nature of the medical evidence? And do you challenge the authenticity of that evidence? No finding was ever made regarding the authenticity of the evidence. Essentially, they just found that this evidence contradicted his testimony. What was that evidence? That evidence was a printout from his hometown hospital evidencing medical treatment over a number of years, including both the period when he served in the military and the 1999 incident. And what did the medical evidence show with respect to this coma? It showed that he did suffer head injury and suffered loss of consciousness, disoriented as his time and place. Okay. But the government did not challenge the authenticity of that evidence? No. The ultimate challenge is just that because the evidence was inconsistent with his claim and because there's inconsistencies among the facts in his claim, that we can't figure out what exactly happened. The applicant's claim is not credible. I have a question about the birth certificate issue. Yes. Is there any claim here by anybody, either at the administrative level or now, that this gentleman is, in fact, a Roma? That he is, in fact? Is a Roma? Is there any claim by? Are you claiming? Is the government claiming? Or has it ever claimed that he may not be a Roma? He was adopted into a Roma family. Certainly. The initial immigration judge did make some findings regarding his knowledge regarding Roma traditions, but subsequent decisions by the agency did not rely on that, so there's no findings to that. We're assuming that he is, in fact, a Roma and that his parents had Roma names which were on his birth certificate, but that he had a Bulgarian name? Correct. On the birth certificate. Isn't that consistent with the adoption? Well, the inconsistency there identified by the agency wasn't relevant to the adoption but to the fact that he had testified that all Roma were forced to change their Roma names to Bulgarian names in 1980, that his parents, in fact, did do so, but yet this birth certificate still reflects them using their Roma names when they allegedly changed to. That could be a bureaucratic act that had nothing to do with him or even his parents, right? I don't see how that's material at all. Very frankly. Is there any claim, is there any doubt here that Romas are persecuted in Eastern Europe? There's definitely evidence that they are subject to discriminatory treatment and some abuse. I wouldn't say that the group as a whole is always persecuted or suffers harm rising to the level of persecution. I don't think there's evidence and there's no agency finding regarding whether or not there's a pattern of practice of persecution of Romas, but there is evidence and the record suggests that they're subject to mistreatment. I see my time is almost up. If there are no further questions, respondent requests. Thank you. You've saved some time. If I may respond to the government and I'll take all the issues. The first one is with the leave. Your Honor, first of all, we're talking about the compulsory medical army service in Bulgaria during communist time. It was two years everybody was supposed to go in. Now, the reality is that if Mr. Lukov have presented a claim only on what he suffered in the military, he will clearly not be eligible for asylum because the response will be, well, you are no longer a conscript, the communist is gone, so who's going to harm you? The trust of this claim is that after communists fell, after this man believed that things would change, he became politically active and because of his perceived Roma identity, and again, he testified that he was adopted, so we do not know what his DNA is. What we know is that he was raped by Romani and he grew up in a Romani neighborhood and he was considered a Roma child. So the question is whether by reason of his political involvement in Roma groups, the mistreatment he suffered in 1994 and 1999 by the post-communist regime amounts to a claim that will be cognizable under Section 208. So what happened in the army gives a context, but it's certainly not central. With respect to the 1999 incident, I will read what the medical record says. Surgical department, suffered a beating by non-individual, cannot recollect the incident, complaints of severe headaches, nausea, vomiting, vertigo. Objective, swelling on the head, hematomas on the entire body, not cognizant of the time and place. Partial eligible, direction to neurosurgeon. This is what the 1999 contemporaneous record. And as esteemed counsel said, the record is the contemporaneous record kept by the local hospital for a period of 20 years. So we have different doctors reflecting when this man went to the hospital. Now, one of the 1987 incidents that was considered by the IJ, it clearly states he went to see the doctor because he was beaten by a non-individual. So the document shows that he went, while in the army, he went to see somebody in his hometown because he was a victim of an assault. So the records support the fact. And also, his statement states, on one of my leaves, I got married. So it clearly, the statement that was presented at the beginning of the claim, clearly states that there was more than one leave. When IJ Hollis tells them, how many leaves did you have? He said, I don't recall. Now, again, the judge issued a term of art, a leave. And Mr. Lukov responded, I believe the term naturally requires him to respond when he was authorized to leave. And he consistently testified, they gave me a leave to get married, they refused to give me a leave when my first son was born and beat me very badly. Now, nobody asked him, how many times did you left the station? Well, I believe in this case, if the judge wanted to test to lay the ground for a negative credibility determination, he should have asked not how many leaves did you have or how many times did you left the garrison. He didn't. I don't believe that a sloppy or not artfully phrased question should be held to the detriment of the applicant who tried to be as credible as he could. And with respect to the Roma certificate, the honors, what Mr. Lukov testified is that in 1980, the government forced all Roma to change their name. His name was changed from Yashko Tayerov to Yanko Lukov. Now, clearly, he kept that name. His wife, who is Bulgarian, keeps that name. His U.S. citizen child has that name. What he testified is that everybody, including his family, had the Roma name. Now, if that was identified, we could very easily have shown that after the Communists fell in 1996, the government allowed people to restore their names, even post-mortem. So if the court has any questions, I see my time is up. I have one minute. Do the courts have any questions? I think not. I thank both sides for your helpful arguments. Lukov v. Lynch now submitted for decision.
judges: Tashima, W. Fletcher, Gettleman